**MID–CONTINENT INSURANCE COMPANY, Appellant,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Appellee.**

No. 05–0261.

Supreme Court of Texas.

Argued Oct. 18, 2005.

Decided Oct. 12, 2007.

Brian L. Blakeley, Carrie D. Holloway, Blakeley & Reynolds, P.C., San Antonio, for appellant.

Richard A. Capshaw, Capshaw Goss & Bowers, Mikel J. Bowers, Capshaw Weiland Goss & Bowers, Dallas, for appellee.

Justice WAINWRIGHT delivered the opinion of the Court.

This dispute between one primary liability insurer and another primary insurer that also provides the applicable excess insurance policy comes to us on certified questions from the United States Court of Appeals for the Fifth Circuit. Pursuant to article V, section 3–c of the Texas Constitution and Texas Rule of Appellate Procedure 58.1, we answer the following questions:

1. Two insurers, providing the same insured applicable primary insurance liability coverage under policies with $1 million limits and standard provisions (one insurer also providing the insured coverage under a $10 million excess policy), cooperatively assume defense of the suit against their common insured, admitting coverage. The insurer also issuing the excess policy procures an offer to settle for the reasonable amount of $1.5 million and demands that the other insurer contribute its proportionate part of that settlement, but the other insurer,

unreasonably valuing the case at no more than $300,000, contributes only $150,000, although it could contribute as much as $700,000 without exceeding its remaining available policy limits. As a result, the case settles (without an actual trial) for $1.5 million funded $1.35 million by the insurer which also issued the excess policy and $150,000 by the other insurer.

In that situation is any actionable duty owed (directly or by subrogation to the insured's rights) to the insurer paying the $1.35 million by the underpaying insurer to reimburse the former respecting its payment of more than its proportionate part of the settlement?

2. If there is potentially such a duty, does it depend on the underpaying insurer having been negligent in its ultimate evaluation of the case as worth no more than $300,000, or does the duty depend on the underpaying insured's evaluation having been sufficiently wrongful to justify an action for breach of the duty of good faith and fair dealing for denial of a first party claim, or is the existence of the duty measured by some other standard?

3. If there is potentially such a duty, is it limited to a duty owed the overpaying insurer respecting the $350,000 it paid on the settlement under its excess policy?

*Liberty Mut. Ins. Co. v. Mid–Continent Ins. Co.,* 405 F.3d 296, 310 (5th Cir.2005). We answer the first question in the negative, and therefore do not reach the second and third questions.

## I. Background

In November 1996, an automobile accident occurred in the construction zone of a State of Texas highway project. A westbound car driven by Tony Cooper on the lanes narrowed by construction crossed

into oncoming traffic and collided with an eastbound car driven by James Boutin and occupied by his family. All members of the Boutin family suffered substantial injuries. Kinsel Industries was the general contractor on the highway project. Crabtree Barricades was Kinsel's subcontractor responsible for signs and dividers. The Boutin family sued Cooper, the State, Kinsel, and Crabtree in the state district court of Liberty County, Texas, for damages resulting from the accident.

Kinsel was the named insured under Liberty Mutual Insurance Company's $1 million comprehensive general liability (CGL) policy. Liberty Mutual also provided Kinsel with $10 million in excess liability insurance. Crabtree was the named insured under Mid–Continent Insurance Company's $1 million CGL policy. Mid–Continent's policy identified Kinsel as an additional insured for liability arising from Crabtree's work. Kinsel, therefore, was a covered insured under two CGL policies, both of which provided Kinsel with $1 million in indemnity coverage for the underlying suit. The insurers had no contract between them that was implicated by the automobile accident.

The CGL policies contained identical "other insurance" clauses providing for equal or pro rata sharing up to the co-insurers' respective policy limits if the loss is covered by other primary insurance:

4. Other Insurance.

If other valid and collective insurance is available to the insured for a loss we cover under Coverages A ['Bodily Injury and Property Damage Liability'] or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

... If this insurance is primary our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

...

c. Method of Sharing

If all of the other insurance permits contribution by equal shares, ... each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

Each policy also contained a "voluntary payment" clause,[1] a subrogation clause,[2] and a version of the standard "no action" clause.[3]

Liberty Mutual and Mid–Continent do not dispute that each owed some portion of Kinsel's defense and indemnification. The

---

1. The "voluntary payment" clauses provided, "No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."

2. The subrogation clauses provided, "If the insured has rights to recover all or part of any payment we have made under this Coverage Part ['Bodily Injury or Property Damage Liability'], those rights are transferred to us."

3. "A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part ['Bodily Injury or Property Damage Liability'] or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative."

insurers agreed that a total verdict for the Boutins against all defendants would be around $2 to $3 million, but they disagreed on the settlement value of the case against Kinsel. Initially both insurers estimated Kinsel's percentage of fault between ten percent and fifteen percent, but as the case progressed Liberty Mutual increased its estimate to sixty percent. After repeated refusals by Mid–Continent to increase its contribution to a settlement, Liberty Mutual agreed at a mediation with the Boutins to settle on behalf of Kinsel for $1.5 million (sixty percent of a $2.5 million anticipated verdict). Liberty Mutual demanded Mid–Continent contribute half, but Mid–Continent continued to calculate the settlement value of the case against Kinsel at $300,000 and agreed to pay only $150,000. Liberty Mutual, therefore, funded the remaining $1.35 million, paying $350,000 more than its $1 million CGL policy limit. Liberty Mutual reserved the right to seek recovery against Mid–Continent for its portion of the settlement. Sometime later, before trial, Mid–Continent settled the Boutins' claim against Crabtree for $300,000. Liberty Mutual sued Mid–Continent in the 191st Judicial District Court of Dallas County, Texas, seeking to recover Mid–Continent's pro rata share of the sum paid to settle the Boutin family's claim against Kinsel. Mid–Continent timely removed the case to federal court on diversity grounds. After a bench trial, the United States District Court for the Northern District of Texas concluded that Liberty Mutual was entitled through subrogation to recover $550,000 from Mid–Continent. *Liberty Mut. Ins. Co. v. Mid–Continent Ins. Co.,* 266 F.Supp.2d 533, 544, 546 (N.D.Tex.

2003). Relying on *General Agents Insurance Co. of America v. Home Insurance Co. of Illinois,* 21 S.W.3d 419 (Tex.App.-San Antonio 2000, pet. dism'd by agr.), the district court determined that each insurer owed a duty to act reasonably in exercising its rights under the CGL policies. *Liberty Mut. Ins.,* 266 F.Supp.2d at 542. It found that Mid–Continent was objectively unreasonable in assessing Kinsel's share of liability, and that Liberty Mutual was reasonable in assessing the same and in accepting the Boutins' settlement offer. *Id.* at 543–44. Specifically, the district court stated that "Mid–Continent's recalcitrance to consider any change, despite the changing circumstances, was unreasonable, causing it to unreasonably assess its insured's exposure," while on the other hand Liberty Mutual, "[b]y agreeing to settle for [$1.5 million] ... resolved the case within policy limits, based on a reasonable estimation of Kinsel's liability, and avoided the real potential of joint and several liability." *Id.* at 544.

Therefore, the district court concluded that, whether apportioned pro rata or in equal shares, Mid–Continent was liable in subrogation for $750,000, one-half of the $1.5 million settlement with Kinsel. *Id.* at 546.[4] Because Mid–Continent already paid $450,000 of its $1 million policy limit in settlement ($150,000 for the suit against Kinsel and $300,000 for the suit against Crabtree), the district court ordered Mid–Continent to pay only $550,000. *Id.* Although this amount is $50,000 short of Mid–Continent's $750,000 share of the Kinsel settlement, the district court found no justification for increasing Mid–Continent's total liability above its $1 million

**4.** At trial the parties disputed how many policies should be considered in apportioning the cost of the settlement, as Liberty Mutual also held a business auto policy and excess policy in favor of Kinsel. *Id.* at 539. Because the Fifth Circuit's certified questions presume the loss triggered only Mid–Continent's and Liberty Mutual's CGL policies, our answers consider only these two policies.

policy limit. *Id.* Mid–Continent appealed, and the Fifth Circuit certified questions of law to this Court. TEX.R.APP. P. 58.1. We accepted the certified questions.

## II. Discussion

Liberty Mutual defends the district court's $550,000 award on grounds that it is entitled to reimbursement through the contractual subrogation clause in its CGL policy and through the type of equitable subrogation applied in *General Agents.* Liberty Mutual argues it is subrogated to the contractual right of Kinsel to enforce language in Mid–Continent's policy that places a duty on Mid–Continent to defend any claim or suit and pay an equal or pro rata share of settlement. Liberty Mutual also contends it is subrogated to the common law right of Kinsel to have Mid–Continent act reasonably when handling an insured's defense—including reasonable negotiation and participation in settlement. The latter suggests we expand or create a modified *Stowers* duty in the circumstances of this case.

Mid–Continent contends that it did not breach any recognized contractual or common law duty to Kinsel to which Liberty Mutual may be subrogated. Mid–Continent further argues that it owed no direct duty to Liberty Mutual upon which reimbursement may be based. Any new duty in this context created by *General Agents* and adopted by the district court, Mid–Continent continues, is contrary to Texas law.

Specifically, with respect to subrogation, Mid–Continent denies that Kinsel has an enforceable contract right to which Liberty Mutual may be subrogated. Mid–Continent explains that because it complied with its contractual duty to timely assume defense of the suit against Kinsel and acknowledged policy coverage, Kinsel—and therefore Liberty Mutual—has no contract claim against Mid–Continent. Mid–Continent relies on the voluntary payment and no-action clauses in its policy to limit its liability to the amounts it consented to pay.

Mid–Continent adds that its only common law duty to Kinsel in this third party context was the *Stowers* duty to accept a reasonable settlement offer within policy limits from the Boutins, or else be liable for any excess judgment against Kinsel. *See G.A. Stowers Furniture Co. v. Am. Indem. Co.,* 15 S.W.2d 544, 547 (Tex. Comm'n App.1929, holding approved); *Md. Ins. Co. v. Head Indus. Coatings & Servs., Inc.,* 938 S.W.2d 27, 28 (Tex.1996) (superceded by statute). Claiming there was no offer within policy limits and no excess judgment, Mid–Continent asserts *Stowers* cannot apply in this case.

Asserting that no direct action exists between co-insurers in Texas, Mid–Continent points to *Traders & General Insurance Co. v. Hicks Rubber Co.,* 140 Tex. 586, 169 S.W.2d 142 (1943) and *American Centennial Insurance Co. v. Canal Insurance Co.,* 843 S.W.2d 480 (Tex.1992). In *Hicks Rubber,* we held that a direct contribution action does not exist between co-insurers when their policies contain other insurance clauses. 169 S.W.2d at 148. Similarly in *Canal,* the Court declined to recognize a direct action between an excess liability insurer and a primary liability insurer. 843 S.W.2d at 483. Mid–Continent adds that the lack of litigation in Texas between co-primary insurers disconfirms any need to create a right of reimbursement between them.

Liberty Mutual's claim for reimbursement involves the contractual and common law duties of an insurer in two distinct scenarios. The first scenario involves the ability of one co-insurer to compel a second co-insurer's proportionate participation in the settlement of a third party claim. The second scenario, which arises from the

first through Liberty Mutual's claim of subrogation, involves the ability of an insured to compel an insurer's proportionate participation in the settlement of a third party claim. Because no statute applies in the third party context, the scenarios are matters of common law contract and tort.

We agree with Mid–Continent and conclude that Liberty Mutual is not entitled to reimbursement because there is no direct duty of reimbursement between these co-primary insurers, and because Kinsel has no rights against Mid–Continent to which Liberty Mutual may be subrogated. We disapprove of *General Agents* to the extent it would provide recovery to an overpaying co-primary insurer in the context presented.

### A. Contribution

Even though Liberty Mutual does not expressly argue for a right of contribution, its reliance on *General Agents* necessarily implies such. Thus, we analyze whether Liberty Mutual has a direct action for reimbursement under a right of contribution from Mid–Continent.

We recognized long ago in *Hicks Rubber* "the general rule that, if two or more insurers bind themselves to pay the entire loss insured against, and one insurer pays the whole loss, the one so paying has a right of action against his co-insurer, or co-insurers, for a ratable proportion of the amount paid by him, because he has paid a debt which is equally and concurrently due by the other insurers." *Hicks Rubber,* 169 S.W.2d at 148. The right of action is one of contribution, the elements of which require that the several insurers share a common obligation or burden and that the insurer seeking contribution has made a compulsory payment or other discharge of more than its fair share of the common obligation or burden. *Employers Cas. Co. v. Trans. Ins. Co.,* 444 S.W.2d 606, 609

(Tex.1969) (citing 18 Am.Jur.2d *Contribution* § 7 (2004)).

We also recognized in *Hicks Rubber,* however, that this direct claim for contribution between co-insurers disappears when the insurance policies contain "other insurance" or "pro rata" clauses. 169 S.W.2d at 148. A pro rata clause operates to ensure that each insurer is not liable for any greater proportion of the loss than the coverage amount in its policy bears to the entire amount of insurance coverage available. *Id.* at 147. The effect of the pro rata clause precludes a direct claim for contribution among insurers because the clause makes the contracts several and independent of each other. *Id.* With independent contractual obligations, the co-insurers do not meet the common obligation requirement of a contribution claim—each co-insurer contractually agreed with the insured to pay only its pro rata share of a covered loss; the co-insurers did not contractually agree to pay each other's pro rata share. *Employers Cas. Co.,* 444 S.W.2d at 609. In addition, the co-insurer paying more than its contractually agreed upon proportionate share does so voluntarily; that is, without a legal obligation to do so. *Id.* at 609–10. Thus, a co-insurer paying more than its proportionate share cannot recover the excess from the other co-insurers. *Hicks Rubber,* 169 S.W.2d at 148. The effect is not the same with respect to the insured's right of recovery. When an insured is covered by multiple policies containing pro rata clauses, *and the insured has not been fully indemnified,* the insured may enforce this contractual obligation to recover the multiple insurers' shares of the covered loss, so long as the shares are within the respective insurers' policy limits. *See id.* at 147–48.

The CGL policies at issue here contain pro rata clauses. Liberty Mutual and

Mid–Continent contractually agreed in their respective policies to pay a proportionate share of Kinsel's covered loss up to $1 million. The co-insurers did not, however, contract with each other to create obligations between themselves or to pay each other's proportionate share of Kinsel's loss. There is no contractual right of contribution between them, and the presence of the pro rata clauses in the CGL policies precludes an equitable contribution claim. In this situation, no contractual obligations exist between co-insurers to apportion between themselves the payment on behalf of the insured, and we are not persuaded to create such an obligation under the common law. *Cf. Canal,* 843 S.W.2d at 483 (declining to recognize an excess insurer's right to bring a direct action for reimbursement from a primary insurer).

This conclusion is contrary to the holding of the San Antonio Court of Appeals in *General Agents,* which appears to have recognized a new duty between co-insurers to reasonably exercise their rights under an insurance policy given the totality of the circumstances. 21 S.W.3d at 426. There, two insurers, General Agents Insurance Company of America, Inc. (GAINSCO) and The Home Insurance Company of Illinois (Home), concurrently held identical $1 million policies in favor of Power Equipment. *Id.* at 421. It is unclear from the opinion whether the policies contained pro rata clauses. Still, both insurers acknowledged coverage and provided defense in a personal injury suit against Power Equipment. *Id.* at 422. The insurers differed in their assessment of prevailing at trial. *Id.* Home was willing to offer $1 million in settlement, while GAINSCO would offer no more than $250,000. *Id.* Home settled for $1.25 million, an amount funded $1 million by Home and $250,000 by GAINSCO. *Id.* Home sued GAINSCO for $375,000 (one half the $1.25 million

settlement less the $250,000 paid by GAINSCO), and recovered judgment based on the jury finding that $1.25 million was "the fair and reasonable amount that should have been paid to settle" the claim against Power Equipment. *Id.* at 423.

On GAINSCO's appeal, the San Antonio Court of Appeals reversed and remanded for a new trial, holding that "[t]he trial court should have submitted a question to the jury that inquired about the reasonableness of GAINSCO's position and actions in exercising its rights under its policy given the totality of the circumstances." *Id.* at 426 (listing various factors a jury should consider). According to the court, "GAINSCO's willingness to proceed with the defense of the lawsuit and its right to enforce the no-action clause in its policy ... [had to] be balanced against Home's desire to settle for policy limits and its co-equal right to control the defense and settlement of the lawsuit." *Id.* at 424.

The *General Agents* opinion suggests that breach of this duty would provide, through subrogation, an overpaying co-insurer with a right of reimbursement for the excess from the breaching co-insurer. *Id.* at 426. Although it characterized the right of action as one of subrogation, the *General Agents* court did not identify the rights of the common insured to which Home could be subrogated to recover its overpayment from GAINSCO. Rather, by balancing Home's interests with those of GAINSCO, the court appeared to premise a right of reimbursement on a direct duty between co-insurers to act reasonably in exercising their policy rights. *Id.* at 426. For the reasons outlined above, we disagree with *General Agents* to the extent it creates a common law duty between co-primary insurers to reasonably exercise rights under an insurance policy.

## B. Subrogation

Acknowledging that a right of contribution does not exist in this context, Liberty Mutual contends it can seek reimbursement through contractual or equitable subrogation to the rights of Kinsel. Both *Hicks Rubber* and *Employers Casualty* contain language suggesting that such an avenue of reimbursement could exist.

In *Employers Casualty*, after precluding a right to contribution, we said that the co-insurers' remedy for reimbursement would lie in contractual or equitable subrogation. 444 S.W.2d at 610. In *Hicks Rubber*, a case relied upon in *Employers Casualty*, we said that when several insurance policies covering the same loss contain pro rata clauses, none of the co-insurers has a right to contribution from the others, "nor will the payment of the whole loss by any of them discharge the liability of the others." 169 S.W.2d at 148. This language suggests that payment of the insured's entire loss by one co-insurer does not relieve the other co-insurers' contractual obligations *to the insured* to pay their pro rata share of the loss. *Id.* The implication is that the insured would still have a right to enforce the contractual obligation, and presumably, that the co-insurer seeking reimbursement could be subrogated to this right.

Having a right to subrogation, however, is distinct from the ability to recover under that right. *See Esparza v. Scott & White Health Plan,* 909 S.W.2d 548, 551 (Tex. App.-Austin 1995, writ denied) ("While an insurance contract providing expressly for subrogation may remove from the realm of equity the question of *whether* the insurer has a right to subrogation, it cannot answer the question of *when* the insurer is actually entitled to subrogation or *how much* it should receive."). In *Hicks Rubber* and *Employers Casualty* we did not apply the particular facts to the elements of the suggested right to subrogation to determine if the overpaying co-insurer could actually recover. Doing so here, we determine that the facts preclude recovery because Liberty Mutual cannot meet the elements of subrogation.

■ There are two types of subrogation. *See id.* at 551. Contractual (or conventional) subrogation is created by an agreement or contract that grants the right to pursue reimbursement from a third party in exchange for payment of a loss, while equitable (or legal) subrogation does not depend on contract but arises in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter. *Argonaut Ins. Co. v. Allstate Ins. Co.,* 869 S.W.2d 537, 542 (Tex.App.-Corpus Christi 1993, writ denied); *see also* Lee R. Russ & Thomas F. Segalla, 16 Couch on Insurance § 223:1 (3d ed.2005).[5] In either case, the insurer stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defenses held by the third party against the insured. *See Interstate Fire Ins. Co. v. First Tape, Inc.,* 817 S.W.2d 142, 145 (Tex.App.-Houston [1st Dist.] 1991, writ denied); *Int'l Ins. Co. v. Med.-Prof'l Bldg. of Corpus Christi,* 405 S.W.2d 867, 869 (Tex.Civ.App.-Corpus

---

**5.** "In the context of equitable subrogation, 'Texas courts have been liberal in their determinations that payments were made involuntarily.'" *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 20 S.W.3d 692, 702 (Tex.2000) (quoting *Argonaut Ins. Co.,* 869 S.W.2d at 542). An insurer is not a volunteer if it pays a third party claim against its insured in good faith and under a reasonable belief that the payment is necessary to its protection. *Id.* (citing *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Aries Marine Corp.,* 932 F.2d 442, 447 (5th Cir.1991)).

Christi 1966, writ ref'd n.r.e.); *see also* 16 COUCH ON INSURANCE § 222:5. Privity of contract between the insurers is not necessary. *Phipps v. Fuqua,* 32 S.W.2d 660, 663 (Tex.Civ.App.-Amarillo 1930, writ ref'd).

### 1. Kinsel's Potential Contractual Rights

■ Liberty Mutual asserts a right to subrogation in equity and through the subrogation clause found in its CGL policy. In either case, Liberty Mutual must step into Kinsel's shoes to assert only those rights held by Kinsel against Mid–Continent, subject to any defenses held by Mid–Continent against Kinsel. *See Interstate Fire,* 817 S.W.2d at 145; *Med.-Prof'l Bldg. of Corpus Christi,* 405 S.W.2d at 869. The potential rights of Kinsel to which Liberty Mutual may be subrogated stem from the contractual and common law duties an insurer owes its insured, which Liberty Mutual and Mid–Continent both owed to Kinsel. We analyze in turn Kinsel's right to enforce these duties.

Liberty Mutual argues it is subrogated to the contractual right of Kinsel to enforce language in Mid–Continent's policy imposing a duty upon Mid–Continent to defend and indemnify Kinsel and to pay a pro rata share of settlement. We agree that the co-insurers' contractual duties to Kinsel were specified in the CGL policies and included, as discussed above, a several and independent duty to pay a pro rata share of a covered loss up to their respective policy limits. *See Hicks Rubber,* 169 S.W.2d at 147. But this duty cannot be viewed independent of the purpose of a pro rata clause, nor without consideration of the rules of indemnification. As Mid–Continent validly asserts, Kinsel has no right, after being fully indemnified, to enforce Mid–Continent's duty to pay its pro rata share of a loss.

■ A liability policy obligates an insurer to indemnify the insured against a covered loss arising from the insured's own legal liability. *Members Mut. Ins. Co. v. Hermann Hosp.,* 664 S.W.2d 325, 327 (Tex.1984). An insured's right of indemnity under an insurance policy is limited to the actual amount of loss. *Paramount Fire Ins. Co. v. Aetna Cas. & Sur. Co.,* 163 Tex. 250, 353 S.W.2d 841, 844, 845 (1962). Where two different policies provide coverage for a loss, the pro rata clause does not create an exception to the principle of indemnity, but rather implements that principle by eliminating the potential for double recovery by the insured. *See Ortiz v. Great Southern Fire and Cas. Ins. Co.,* 597 S.W.2d 342, 343 (Tex.1980) ("One reason that the right of equitable subrogation is granted to an insurer is to prevent the insured from receiving a double recovery."); *Fireman's Fund Ins. Co. v. Md. Cas. Co.,* 65 Cal.App.4th 1279, 77 Cal. Rptr.2d 296, 305 (1998) ("The fact that several insurance policies may cover the same risk does not increase the insured's right to recover for the loss, or give the insured the right to recover more than once.").

> [W]here there are several policies of insurance on the same risk and the insured has recovered the full amount of its loss from one or more, but not all, of the insurance carriers, the insured has no further rights against the insurers who have not contributed to its recovery. Similarly, the liability of the remaining insurers *to the insured* ceases, even if they have done nothing to indemnify or defend the insured.

*Fireman's Fund Ins. Co.,* 77 Cal.Rptr.2d at 305.

■ Equity does not demand a different result here. We hold, therefore, that a fully indemnified insured has no right to recover an additional pro rata portion of

settlement from an insurer regardless of that insurer's contribution to the settlement. Having fully recovered its loss, an insured has no contractual rights that a co-insurer may assert against another co-insurer in subrogation.

## 2. Kinsel's potential common law rights

Liberty Mutual also argues it is subrogated to the common law right of Kinsel to enforce Mid–Continent's duty to act reasonably when handling an insured's defense—including reasonable negotiation and participation in settlement. An insurer's common law duty in this third party context is limited to the *Stowers* duty to protect the insured by accepting a reasonable settlement offer within policy limits. *See Stowers,* 15 S.W.2d at 547. *Stowers* is the only common law tort duty in the context of third party insurers responding to settlement demands. *Md. Ins. Co.,* 938 S.W.2d at 28 (citing *Tex. Farmers Ins. Co. v. Soriano,* 881 S.W.2d 312, 318 (Tex.1994) (Cornyn, J., concurring)). "The *Stowers* duty is not activated by a settlement demand unless three prerequisites are met: (1) the claim against the insured is within the scope of coverage, (2) the demand is within the policy limits, and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment." *Am. Physicians Ins. Exch. v. Garcia,* 876 S.W.2d 842, 849 (Tex.1994) (citing *Stowers,* 15 S.W.2d at 547). A demand above policy limits, even if reasonable, does not trigger the *Stowers* duty to settle. *Id.*

Mid–Continent did not breach a *Stowers* duty to Kinsel because the Boutins did not make a settlement offer within Mid–Continent's policy limits. *See id.* (settlement demand must be within policy

limits to trigger *Stowers* duty). We decline to modify *Stowers* to create rights for Kinsel and therefore, Liberty Mutual, via subrogation. In addition, we note Liberty Mutual paid a debt for which it too was primarily liable, thus not satisfying the traditional subrogation requirement that the subrogee pay a debt for which another was primarily liable. *See Argonaut Ins. Co.,* 869 S.W.2d at 542; *see also* 16 COUCH ON INSURANCE § 223:1; 44 AM.JUR.2D *Insurance* § 1787, at 256 (2003) ("[T]he doctrine of subrogation is inapplicable if the liability insurer seeking subrogation is the one primarily liable; and the doctrine is inapplicable if the effect of the respective policies is to establish equal liability." (footnotes omitted)).

The present situation differs from the issue we addressed in *Canal.* 843 S.W.2d at 482. In *Canal,* we recognized equitable subrogation as a basis for an excess insurer's recovery against a primary insurer to prevent a primary insurer from taking advantage of an excess insurer, acting solely as such, when a potential judgment approaches the primary insurer's policy limits. *Id.* at 483. The excess insurer would be forced to pay for a debt for which another insurer was primarily liable. In this case, however, Liberty Mutual played a dual role as primary insurer and excess insurer and was in a position to negotiate a good faith settlement on Kinsel's behalf. Equity demanded a remedy for the excess insurer in *Canal,* but here equity does not favor such a remedy. A reasonable primary insurer, which did not improperly handle the claim, would not pay more than its primary policy limits. In paying $350,000 more than its $1 million policy limits, Liberty Mutual seems to have been motivated by concern for its excess insurance policy. Mid–Continent cannot be required to agree to a settlement that requires payment in excess of its remaining coverage to protect Liberty Mutual's excess insurance interests.

## III. Conclusion

In response to the first certified question, we conclude there is no right of reimbursement in the context presented. Therefore, we do not reach questions two and three. Kinsel has no common law cause of action against Mid–Continent, nor does it have, after being fully indemnified, any contractual rights remaining against Mid–Continent. Because Kinsel has no rights to which Liberty Mutual may be subrogated, Liberty Mutual has no right of reimbursement through subrogation. Of course, how our answer is applied in the case before the Fifth Circuit Court of Appeals is solely the province of that certifying court. *See Amberboy v. Societe de Banque Privee,* 831 S.W.2d 793, 798 (Tex. 1992).

Justice WILLETT filed a concurring opinion.

Justice WILLETT, concurring.

I concur with the Court's answer to the first certified question and with the Court's analysis. I write only to provide some additional thoughts on why Texas law should not recognize a claim by one primary insurer against another in these circumstances.

At the outset I emphasize my belief that we must confine ourselves to the factual circumstances presented. This Court frequently finds itself deciding high-stakes insurance law questions, which, for me at least, can be fiendishly difficult. With some regularity these questions originate in the form of certified questions from the United States Court of Appeals for the Fifth Circuit. The Fifth Circuit appreciates that the outcomes of these cases often pivot heavily on the underlying facts, and here it has continued its excellent practice of providing us with a detailed compendium of the relevant facts. Some insurance cases present recurring issues, and, of course, courts must scrupulously apply governing legal principles, but it is indisputable that case outcomes are often driven by unique factual circumstances.

Here, the body of precedent presenting similar but not identical issues deserves our respect and most careful analysis, but with an appreciation of the factual differences between those cases and the one before us now. We should start with the principle that Mid–Continent's primary, if not exclusive, contractual and common-law duty is to its insured, Kinsel Industries. Mid–Continent did not deny coverage or sit idly on the sidelines; it participated in the defense but disputed Liberty Mutual's subjective assessment of what the case was worth. I see no basis for concluding that Mid–Continent, by taking a hard line in negotiations, breached a duty to Kinsel— to defend, to exercise good faith, to settle within policy limits, or any other contractual or common-law duty an insurer might owe its insured. Kinsel purchased insurance and got what it paid for, a legal defense of the claim against it and a settlement within policy limits, both funded by its insurers. Not surprisingly, Liberty Mutual, with Kinsel as its named (as opposed to additional) insured and vastly greater exposure because of its excess policy, paid most of the settlement.

Insurance companies are not eleemosynary institutions, and where, as here, the insured is protected throughout the litigation process, insurers are entitled to exercise their business judgment in deciding whether to settle a claim and for how much. I see no reason for courts in these circumstances to prohibit insurance companies from engaging in sharp negotiations with each other. To hold that primary carrier A has a claim against primary carrier B, because a "reasonable" insurer would have chipped in more toward the settlement, would recognize a cause of action that is unnecessary for the protection of insured parties or insur-

ance companies. Again, here the insurance companies provided the protection for which Kinsel bargained. As for protecting insurance companies from each other, I would not recognize that one owed a duty to protect the business interests of the other. I would treat their negotiations inter se in this case as a matter best left to the business world. Insurance companies that can successfully engage in such negotiations stay in business, as they should as long as they fulfill their duties to their clients.

As a further reason for not recognizing the cause of action Liberty Mutual pursues, claims of this sort present an almost impossibly complex challenge for the fact finder. A jury considering such a claim would have to decide what the reluctant insurer *should* have paid in settlement, based, I suppose, on (1) considering the range of awards that a jury hearing the underlying claim against the insured *might* have awarded (given all manner of tangible and intangible factors that inform such an analysis), (2) arriving at an expected value of the judgment in the underlying case, and (3) factoring into the calculus the implications of the *Stowers* doctrine and what a reasonable insurer would do given this barrage of complicated information.

So I would deny Liberty Mutual's claim. The result would be different if language from the Mid–Continent policy required it to pay more of the settlement. But I see nothing in the policy obliging Mid–Continent to do so, and I agree with the Court that the "other insurance" clause of the Mid–Continent policy, especially when considered with the "voluntary payment" and "no action" clauses, precludes a claim by

Liberty Mutual against Mid–Century for contribution. I also see no claim based on subrogation, whether contractual or equitable, since Liberty Mutual's right of subrogation must be premised on the concept of standing in the shoes of the insured, Kinsel, and here Kinsel has no complaint against Mid–Continent.

The result might also be different in a case involving a primary insurer and an excess carrier, where the primary alone provided the defense and failed to settle within its policy limits,[1] if a judgment had been entered against and paid in part by Kinsel and Mid–Continent refused to cover its proportionate share of the judgment,[2] or if Mid–Continent had denied coverage and had refused to pay anything or defend the insured.[3] But, as emphasized above, the facts matter greatly in these cases, and here the facts are different.

1. See Am. Centennial Ins. Co. v. Canal Ins. Co., 843 S.W.2d 480, 481–82 (Tex.1992).

2. See Traders & Gen. Ins. Co. v. Hicks Rubber Co., 140 Tex. 586, 169 S.W.2d 142, 145–47 (1943).

3. See Employers Cas. Co. v. Transport Ins. Co., 444 S.W.2d 606, 607, 610 (Tex.1969).